UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MARION GLEASON,
W1211 Riverview Drive, Lot #173
Sullivan, WI 53178

    Plaintiff,

v.

FIRST AMERICAN BANKSHARES, INC.
d/b/a PREMIERBANK
70 North Main Street
Fort Atkinson, WI 53238

    Defendant.

Case No.: 15-cv-396
JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff, Marion Gleason, by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendant, First American Bankshares, Inc. d/b/a PremierBank, alleges and shows to the court as follows:

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101, et. seq., and the Family and Medical Leave Act of 1993 ("FMLA"), as amended, 29 U.S.C. § 2601 *et seq*., and 28 U.S.C. § 1343, as this case involves an Act of Congress providing for protection of civil rights.

2. The unlawful employment practices of which Plaintiff complains occurred within the Eastern District of Wisconsin and therefore venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

3. Plaintiff, Marion Gleason, is an Adult female resident of the State of Wisconsin residing in Jefferson County with a post office address of W1211 Riverview Drive, Lot #173, Sullivan, Wisconsin 53178.

4. Defendant, First American Bankshares, Inc. d/b/a PremierBank, was, at all material times herein, a Wisconsin corporation with a principal office address of 70 North Main Street, Fort Atkinson, Wisconsin 53238.

## Ms. Gleason's employment at Premier ank

5. In approximately 2006, Defendant hired Ms. Gleason as a Bookkeeper.

6. Throughout her employment with Defendant as a Bookkeeper, Ms. Gleason reported directly to Sandy Pugh, Bookkeeping Supervisor, who reported directly to Steve Schafer, Loan Officer/Human Resources. Schafer is the son of Defendant's Owner.

7. During Ms. Gleason's employment with Defendant, she consistently met Defendant's work performance expectations of her.

8. In or about 2006 and after Defendant hired Ms. Gleason, Defendant hired Stephanie Petrie as a (position) in its Bookkeeping Department.

9. Ms. Gleason and Ms. Petrie were co-workers until Ms. Gleason's termination from employment with Defendant.

10. On or about November 20, 2014, Defendant terminated Ms. Gleason's employment.

11. At the time of her termination, Ms. Gleason's normal or customary days and hours of work were, respectively 8am to 5pm Monday through Friday, and once per month, Saturday 8:30-11am with a half day on Wednesday.

12. At the time of her termination, Ms. Gleason worked approximately 40 hours per week and was compensated at an hourly rate of $11.14 per hour.

**Ms. Gleason's Depression and Anxiety**

13. Ms. Gleason has suffered from depression since her childhood.

14. In or about 2007, Ms. Gleason told Ms. Pugh that she suffered from depression.

15. In or about 2007, Ms. Gleason told Ms. Pugh that she endured verbal abuse by her parents in her childhood, which contributed to her depression.

16. Subsequent to in or about the year 2007, Ms. Gleason had conversations with Ms. Pugh about her depression, including the fact that her current and ongoing family and personal issues contributed to her depression, that she had doctor's appointments related to her depression, and that she was taking medication for her depression.

17. During Ms. Gleason's employment with defendant, Defendant, including Ms. Pugh, knew or had knowledge of Ms. Gleason's depression.

18. In or about 2011, Ms. Gleason told Ms. Pugh that Ms. Petrie's attitude and behavior towards her reminded her (Ms. Gleason) of her mother's abusive treatment of her, and that Ms. Petrie's conduct contributed to her depression.

19. In or about 2011 or 2012, Ms. Gleason was diagnosed with anxiety.

20. In or about 2011 or 2012, and around the same time that she was diagnosed with anxiety, Ms. Gleason told Ms. Pugh that she was diagnosed with anxiety and that her doctor had prescribed her Xanax to manage her anxiety symptoms.

21. During Ms. Gleason's employment with defendant, Defendant, including Ms. Pugh, knew or had knowledge of Ms. Gleason's anxiety.

22. Ms. Gleason's depression and anxiety caused her to: experience difficulty breathing and sleeping, along with an increased heart rate; have panic attacks and crying bouts; become agitated or frustrated quickly; and have negative thoughts about herself and others, among

other things.

23. Ms. Gleason's depression significantly and negatively affects her brain functioning and her ability to concentrate, communicate, perform hobbies and manual tasks, breath, eat, sleep, think, and work.

24. Ms. Gleason has been diagnosed with Major Depressive Disorder because her depression has so significantly and negatively affected her brain functioning and her ability to concentrate, communicate, perform hobbies and manual tasks, breath, eat, sleep, think, and work.

25. Currently, Ms. Gleason suffers from depression/Major Depressive Disorder and anxiety.

**Defendant's Discrimination of Ms. Gleason and Interference with her FMLA Rights**

26. On or about November 7, 2014, Ms. Gleason saw her treating physician, who, for an appointment to discuss and address her increasing depression and anxiety symptoms.

27. Prior to Ms. Gleason's November 7, 2014 doctor's appointment, Ms. Gleason told Ms. Pugh about her upcoming doctor's appointment.

28. On or about the morning of November 8, 2014, Ms. Pugh met with Ms. Gleason. (hereinafter "the November 8, 2014 meeting").

29. During the November 8, 2014 meeting, Ms. Gleason was visibly emotional and tearful.

30. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that she had been significantly struggling with her depression and anxiety since early 2014.

31. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that her doctor had recently prescribed a new medication for her depression and anxiety.

32. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that her doctor had recently increased her medication to the top dosage for her depression and anxiety. During

the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that her depression and anxiety had been exacerbated to the point where she had recently had suicidal thoughts.

33. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh, "I have been going through some personal issues in regard to depression and suicidal thoughts," or words to that effect.

34. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that her depression and anxiety had been exacerbated to the point where she had recently had negative thoughts about Ms. Petrie.

35. During the November 8, 2014 meeting, Ms. Pugh asked Ms. Gleason, "Have you thought about seeing someone for your emotional problems?" or words to that effect.

36. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that she was considering taking some time off work to manage and properly deal with her depression and anxiety.

37. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh, "I've thought about taking some time off for myself, but I thought I could just deal and cope with things like I always have," or words to that effect.

38. During the November 8, 2014 meeting, Ms. Gleason told Ms. Pugh that she was scared for her own well-being as it related to her suicidal ideations, and told Ms. Pugh about speaking to a friend of hers in April 2014 who helped her think more positively and reconnect to her religious belief. Ms. Pugh responded, "That's good. I'm glad you told me."

39. Subsequent to the November 8, 2014 meeting, Ms. Gleason worked the remainder of her scheduled shift at Defendant.

40. Ms. Gleason was not scheduled to work at Defendant on or about November 9, 2014.

41. On or about November 10, 2014, Ms. Gleason worked her normally scheduled shift at Defendant.

42. On or about November 10, 2014, Laura Halkoski, Customer Service Representative, told Ms. Gleason that Defendant's insurance would cover her seeing a therapist for her depression and anxiety.

43. On or about November 10, 2014, Halkoski provided Ms. Gleason with a list of therapists from ProHealth Care.

44. On or about November 10, 2014, Defendant met with Ms. Gleason after her shift ended that day (hereinafter "the November 10, 2014 meeting").

45. The individuals in attendance at the November 10, 2014 meeting were Ms. Gleason, Schafer, Rochelle Mitchell, Vice President and Marketing Director, and Roy J. Budlong, President and CEO.

46. During the November 10, 2014 meeting, Mr. Schafer told Ms. Gleason that Defendant wanted to talk to her about her conversation with Ms. Pugh on November 8, 2014.

47. During the November 10, 2014 meeting, and after Mr. Schafer told Ms. Gleason that Defendant wanted to talk to her about her conversation with Ms. Pugh on November 8, 2014, Ms. Gleason began crying and told Mr. Schafer she was embarrassed by what she had shared with Ms. Pugh on November 8, 2014 and that she did not intend to hurt anyone, and if she did, it would be herself.

48. During the November 10, 2014 meeting, Mr. Schafer told Ms. Gleason, "We want you to go home and we want you to stay home for the rest of the week with pay," or words to that effect.

49. During the November 10, 2014 meeting, Schafer gave Ms. Gleason information about

EmployeeConnect Services through Lincoln Financial Group (hereinafter referred to as "EmployeeConnect").

50. EmployeeConnect is a third-party program via Lincoln Financial Group that Defendant offered to its employees that provides "support for a variety of issues including: stress, anxiety, depression, family and martial issues, problem solving, drug and alcohol issue, depending and adult care services, workplace concerns, legal issues, and financial questions and issues."

51. During the November 10, 2014 meeting and referencing the information about EmployeeConnect, Mr. Schafer told Ms. Gleason, "We would like for you to take a look at this. There's an 800 number," or words to that effect.

52. During the November 10, 2014 meeting and after providing Ms. Gleason with the information about EmployeeConnect, Schafer told Ms. Gleason, "We're really concerned about you. Do you need a ride home?" or words to that effect.

53. During the November 10, 2014 meeting, Ms. Gleason told Schafer that she was thinking about taking time off of work at Defendant because she was having a difficult time and was struggling with her depression and anxiety.

54. During the November 10, 2014 meeting, Ms. Gleason told Schafer that her doctor had prescribed her additional medication to assist her in coping with her depression and anxiety.

55. At no time during the November 10, 2014 meeting or anytime thereafter did Defendant provide Ms. Gleason with information related to FMLA leave.

56. At no time during the November 10, 2014 meeting or anytime thereafter did Defendant inform Ms. Gleason of her ability to use FMLA leave.

57. At no time during the November 10, 2014 meeting or anytime thereafter did Defendant notify Ms. Gleason of her eligibility status and/or rights and responsibilities under the

FMLA.

58. At no time during the November 10, 2014 meeting or anytime thereafter did Defendant discuss possible job accommodations with Ms. Gleason.

59. On or about November 11, 2014, Ms. Gleason contacted EmployeeConnect and scheduled a session with a therapist for November 13, 2014.

60. On or about November 13, 2014, Ms. Gleason attended the EmployeeConnect therapy session and was diagnosed, for the first time, with Post Traumatic Stress Disorder or PTSD.

61. On November 18, 2014, Ms. Gleason attended a second EmployeeConnect therapy session.

62. Between November 11, 2014 and November 18, 2014, Defendant did not contact Ms. Gleason.

63. On November 19, 2014, Mr. Schaefer called Ms. Gleason via telephone (hereinafter "the November 19, 2014 phone conversation").

64. During the November 19, 2014 phone conversation, Mr. Schaefer asked Ms. Gleason to come in to Defendant for a meeting with him.

65. On November 20, 2014, Ms. Mitchell and Mr. Budlong met with Ms. Gleason at Defendnat (hereinafter "the November 20, 2014 meeting").

66. During the November 20, 2014 meeting, Defendant terminated Ms. Gleason's employment.

67. During the November 20, 2014 meeting, Mr. Budlong told Ms. Gleason that Defendant was terminating her employment because of her conversation with Ms. Pugh on or about November 8, 2014.

68. During the November 20, 2014 meeting, Mr. Budlong told Ms. Gleason, "We have talked to our Human Resources representative and our lawyer and we have decided to terminate your employment," or words to that effect.

69. During the November 20, 2014 meeting, Mr. Budlong told Ms. Gleason, "It's because of that information that we decided to terminate you," or words to that effect, referring to Ms. Gleason's conversation with Ms. Pugh on or about November 8, 2014.

70. During the November 20, 2014 meeting, Mr. Budlong offered Ms. Gleason a severance package.

71. On November 25, 2014, Ms. Gleason attended a third EmployeeConnect therapy session.

72. At the time of Defendant's termination of Ms. Gleason, there were other positions, such as Teller and Customer Service Representative, available at Defendant's various locations – positions into which Defendant could have transferred Ms. Gleason.

## Procedural Posture

73. Subsequent to her termination from Defendant, Ms. Gleason filed a complaint with the Equal Employment Opportunity Commission – Milwaukee Area Office ("EEOC"), designated as Charge No. 443-2015-00785, alleging disability discrimination.

74. The EEOC issued Ms. Gleason a Notice of Right to Sue on Charge No. 443-2015-00785, dated April 20, 2015.

75. Mr. Gleason has exhausted all administrative remedies, filing requirements, and conditions precedent prior to bringing this action.

## Coverage

76. Defendant is a covered employer for purposes of the FMLA.

77. At the time of Ms. Gleason's FMLA leave requests, Defendant employed at least 50 employees within 75 miles of Ms. Gleason's work site.

78. At the time of Ms. Gleason's leave requests in the year 2014, she had been employed at Defendant for 12 months and had worked at least 1250 hours during the prior 12 months.

79. Ms. Gleason did not exceed the amount of FMLA leave for any FMLA leave entitlement period.

80. Ms. Gleason has exhausted all administrative requirements and satisfied all conditions precedent, if any, prior to bringing this action.

### FIRST CAUSE OF ACTION – DISABILITY DISCRIMINATION

81. Ms. Gleason re-alleges and incorporates paragraphs 1-75 of this complaint by reference.

82. Defendant intentionally discriminated against Ms. Gleason in the terms and conditions of her employment on the basis of her disability in reckless disregard for her federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq.*

83. Defendant intentionally discriminated against Ms. Gleason by terminating her employment based on her disability in reckless disregard for her federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq.*

84. As a result of Defendant's intentional discrimination, Ms. Gleason has suffered damages in the form of lost wages and benefits, emotional distress, pain and suffering, and attorneys' fees and costs.

### SECOND CAUSE OF ACTION – FAILURE TO ACCOMMODATE

85. Ms. Gleason re-alleges and incorporates paragraphs 1-75 of this complaint by reference.

86. Defendant intentionally discriminated against Ms. Gleason by failing to reasonably accommodate her disability in reckless disregard for her federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq.*

87. As a result of Defendant's intentional discrimination, Ms. Gleason has suffered damages in the form of lost wages and benefits, emotional distress, pain and suffering, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION – FMLA INTERFERENCE

88. Ms. Gleason re-alleges and incorporates paragraphs 1-80 of this complaint by reference.

89. Defendant intentionally interfered with Ms. Gleason's rights, discriminated against her in the terms and conditions of her employment, and terminated her employment for exercising her rights and for the future exercise of her rights under the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. § 2601 *et seq*.

90. As a result of Defendant's intentional violation of the FMLA, Ms. Gleason has suffered damages in the form of loss of wages and other employment benefits and insurance.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, liquidated damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 26th day of June, 2015.

                          WALCHESKE & LUZI, LLC
                          Counsel for Plaintiff

                          **s/ *Kelly L. Temeyer*_____**
                          James A. Walcheske, State Bar No. 1065635
                          Scott S. Luzi, State Bar No. 1067405
                          Kelly L. Temeyer, State Bar No. 1066294

WALCHESKE & LUZI, LLC
15850 W. Bluemound Road, Suite 304
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheske@walcheskeluzi.com
sluzi@walcheskeluzi.com
ktemeyer@walcheskeluzi.com